IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARK A. PANOWICZ                    :

                                    :

         v.                         :   Civil Action No. DKC 11-2417

                                    :

SHARON L. HANCOCK                   :

                                    :

## MEMORANDUM OPINION

Presently pending and ready for review in this civil rights action are several motions: (1) a motion for summary judgment filed by Defendant Sharon L. Hancock (ECF No. 64); (2) a motion to amend the complaint filed by Plaintiff Mark Panowicz (ECF No. 67); (3) a cross-motion for summary judgment filed by Plaintiff (ECF No. 72); and (4) a motion to supplement Plaintiff's opposition to Defendant's summary judgment motion filed by Plaintiff (ECF No. 86). The relevant issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiff's motion to amend the complaint will be denied. Defendant's motion for summary judgment will be granted, Plaintiff's unopposed motion to supplement his opposition will be granted, and Plaintiff's cross-motion for summary judgment will be denied.

## I.   Background

### A.   Mr. Panowicz's Convictions and Confinement[1]

On December 13, 2004, an indictment was filed in the Circuit Court for Charles County, Maryland, charging Plaintiff Mark A. Panowicz with, *inter alia*, child abuse, child sexual abuse, and third-degree sexual offense. (ECF No. 67-2, at 7). The indictment was later amended to charge second-degree assault, and Plaintiff ultimately entered an Alford plea to that count on April 20, 2005. The remaining charges were nolle prossed. (ECF Nos. 64-5, at 3 and 67-3). The standard procedure in Charles County Circuit Court following a plea allocution is that the courtroom clerk prepares a paper form with the disposition of the case, which is reviewed and

---

[1] Although Plaintiff attempts to dispute some of the facts established by Defendant, he does so by making speculative assertions without providing any evidence to substantiate these assertions. On a motion for summary judgment, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including [but not limited to] depositions, documents, electronically stored information, [and] affidavits or declarations[.]" Fed.R.Civ.P. 56(c)(1)(A). Moreover, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4). Accordingly, Plaintiff's facts were only credited to the extent he provided evidence to support them. In addition, Plaintiff's affidavit (ECF No. 72-3), which states that "[e]ach and every statement proposed as a fact in the Summary Judgment Proposed Facts are true and accurate based on my personal knowledge[,]" was only credited to the extent the facts were based on his personal knowledge.

initialed by the presiding judge. (ECF No. 64-2 ¶ 6). The paper form is then sent to the Clerk's Office where an employee enters the information into the Uniform Case System ("UCS"), the electronic database used to track cases. (*Id.*). Once a criminal defendant is sentenced to confinement in a correctional institution, the Clerk's Office generates a record from UCS and sends the commitment record to the relevant correctional institution. (*Id.* ¶ 7). If the defendant is released on probation, however, the Clerk's Office does not use UCS to generate a commitment record; rather, a copy of the paper form initialed by the judge is given to the Division of Parole and Probation. (*Id.*).

Plaintiff's paper form that was generated on April 20, 2005 during his plea allocution and initialed by the judge listed the correct charge and disposition of his case (ECF No. 64-5, at 3), but an employee in the criminal division of the Clerk's Office failed to amend the original charge of third-degree sex offense in UCS to reflect the final disposition as a second-degree assault conviction. (ECF No. 64-2 ¶ 9). On June 13, 2005, Plaintiff received a two-year suspended sentence and four years of probation for the second-degree assault conviction. (ECF No. 80-1). Following the sentencing, the courtroom clerk prepared a paper docket entry form with the correct disposition of Plaintiff's charges that was initialed and approved by the

3

presiding judge.  The clerk in the criminal division who entered the sentence in UCS did not amend the original charge to correspond with the charge on the paper form.  (ECF No. 64-2 ¶ 9).  Because Plaintiff was not sentenced to any jail time, the Clerk's Office did not generate a commitment record from UCS to send to a correctional institution.  Instead, the paper form from the sentencing hearing that contained the correct disposition of his charge was sent to the probation office, and Plaintiff began serving his four years of probation in accordance with his second-degree assault conviction.  (*Id.* ¶ 7; ECF No. 64-5, at 14).

In 2006, the State of Maryland established a public website called Judiciary Case Search ("JCS") to provide online access to state court case records, including criminal cases.  (ECF No. 64-4 ¶ 4).  To create JCS, the Administrative Office of the Courts ("AOC") Judicial Information Systems personnel uploaded the existing data from UCS and other case management systems used by Maryland county courts into a central database.  (*Id.*). The data upload process was automatic and did not require any manual re-entry of data from UCS into the new database.  During this process, the information concerning Plaintiff's 2005 case in Charles County, including the incorrect charge of third-degree sex assault, was automatically transferred into the

database and eventually uploaded onto the new JCS website. (*Id.*).

In 2006, Plaintiff was charged with an unrelated crime in St. Mary's County, Maryland. After a 2008 bench trial, Plaintiff was found guilty of second-degree assault, and he was sentenced on May 22, 2008 to a five-year prison term with all but eighteen months suspended and work release authorized. (ECF No. 64-5, at 3-4). After his hearing on May 22, Plaintiff was immediately taken into custody and transported to the St. Mary's Detention Center ("Detention Center"). (*Id.*). Shortly after charges were brought in St. Mary's County, a violation of probation proceeding was commenced in Charles County. (*Id.* at 14). On August 22, 2008, the Circuit Court for Charles County found that Plaintiff had violated the terms of his probation and sentenced him to a three-month term of imprisonment to run consecutively to the sentence imposed in St. Mary's County.

At the time of his conviction in St. Mary's County, Plaintiff was employed by Sprint Nextel Corporation ("Sprint"). (ECF No. 64-5, at 4). Prior to his hearing on May 22, 2008, Plaintiff discussed the hearing with Sprint and asked if Sprint would support work release, and Sprint indicated that it would. (*Id.*). Plaintiff obtained authorization from the court for work release during his hearing, and, once he arrived at the Detention Center, attempted to coordinate the details of work

release with Sprint and the Detention Center. (*Id.*). As
requested by the Detention Center, Plaintiff provided Sprint's
contact information and Detention Center officers attempted to
contact Sprint but were unsuccessful. (*Id.* at 5). Plaintiff
then had his girlfriend, Sandra Livesay, and his attorney
attempt to contact Sprint on multiple occasions to obtain its
business license information, which the Detention Center
required in order to release Plaintiff for work release. (*Id.*
at 5-8). Sprint did not return Ms. Livesay's phone calls and
Plaintiff's attorney was also unable to get Sprint to give him
its business license information. Around June 10 or 11, 2008,
Plaintiff was informed by his attorney that Sprint had
terminated his employment. Sprint sent Plaintiff's attorney and
Plaintiff a letter dated May 30, 2008, indicating that Sprint
considered Plaintiff to have abandoned his job voluntarily
because he had been absent from work for more than three
consecutive days starting on Friday, May 23, 2008, without
properly reporting his absence to management. (*Id.* at 8; ECF
No. 72-9). The letter indicated that Sprint considered
Plaintiff voluntarily to have terminated his employment
effective May 23, 2008. (ECF No. 72-9). Although Plaintiff was
still authorized for work release following May 30, 2008, he
could not go out on work release because he had no job to which
he could go.

Plaintiff learned for the first time in late September or early October 2008 from a corrections officer at the Detention Center that he was not eligible to participate in the work release program until he registered as a sex offender because of his 2005 conviction in Charles County. (*Id.* at 10-11). Plaintiff then contacted his attorney to inquire why he was being required to register as a sex offender. Plaintiff's attorney determined that Plaintiff's 2005 conviction was listed incorrectly on the Maryland JCS website as a third-degree sex offense rather than his actual conviction for second-degree assault. (*Id.* at 11). Because he was listed as a third-degree sex offender, the Detention Center required Plaintiff to register as a sex offender before he was permitted to leave the Detention Center, which included leaving for work release. (*Id.*). Plaintiff's attorney drafted a motion asking the court to correct the docket to reflect the correct disposition of Plaintiff's 2005 charges, which was granted and the docket was corrected in November 2008. (*Id.* at 11-12).

Plaintiff learned sometime in September or October of 2008 when speaking with Ms. Livesay that his colleagues at Sprint had seen the Maryland JCS website in May 2008, which showed that Plaintiff had a third-degree sex offense conviction from 2005. (ECF No. 64-5, at 13, 17). According to Plaintiff, the real reason Sprint fired him in May 2008 was because Sprint

management saw his erroneous sex offender conviction on the JCS website. (*Id.* at 13).

After Plaintiff was released from the Detention Center in February 2009, he reached out to former colleagues at Sprint to ask them to serve as references for future job applications and to network in hope of finding a telecommunications job. (ECF No. 72-1 ¶ 44). Only one of Plaintiff's colleagues returned his call and it was to inform him that he could not serve as a reference due to Plaintiff's conviction. (*Id.*).

**B.   Ms. Hancock and the Charles County Circuit Court Clerk's Office**

Defendant Sharon Hancock began working in the Clerk's Office of the Circuit Court for Charles County ("the Clerk's Office") in 1998 as a courtroom clerk. In 2003, she became the Chief Deputy Clerk. (ECF No. 64-2 ¶¶ 2-3). As Chief Deputy Clerk, she was responsible for:

> reviewing and approving leave requests and timesheets, managing billing accounts, implementing the records retention schedule, signing checks, and reviewing closed cases to release and refund cash bail bonds, as well as approving purchases and inventory. [She] was not responsible for establishing the office's training policies, supervising personnel in charge of recording dispositions of criminal cases, or setting the policies and procedures related to the entry of dispositions into the office's case management system. Richard A. Day, III, the Clerk of Court at the time, was responsible for setting these policies.

(ECF No. 64-2 ¶ 3).   On September 19, 2005, Mr. Day passed away unexpectedly.  (*Id.* ¶ 4).  Ms. Hancock became Clerk of Court on September 21, 2005.  (*Id.* ¶ 5).  Ms. Hancock was not the Clerk when Mr. Panowicz entered his Alford Plea in April 2005 or when he was sentenced in June 2005; she did not personally participate in any aspect of Mr. Panowicz's case, or enter his criminal disposition into UCS.  (*Id.* ¶ 8).  Ms. Hancock asserts that she did not learn about the error in Mr. Panowicz's record until 2009.  (*Id.* ¶ 13).  She further asserts that she is "unaware of any other instance where a final criminal disposition from the Circuit Court for Charles County ha[s] been inaccurately recorded in UCS or incorrectly published on the Judiciary Case Search Website."  (*Id.*).

To train its employees, "[t]he Clerk's Office provides on-the-job training to its employees regarding entry of criminal dispositions into UCS.  The Criminal Supervisor, or a trainer designated by her, reviews the work of new employees to ensure its accuracy.  The trainer continues to check the new employee's work until satisfied that the employee understands the process and is performing the task correctly."  (*Id.* ¶ 11).  According to Ms. Hancock, during her tenure as Clerk, the Clerk's Office had:

> an unwritten policy concerning the verification of criminal dispositions entered into UCS.  Under this policy, a

supervisor or senior-level employee would
enter the final disposition into UCS based
on the paper initialed by the judge.   For
cases where the defendant was not sentenced
to a correctional facility, another employee
in the office would check the UCS docket
entry against the paper initialed by the
judge.   For "commitment cases," the Charles
County Detention Center would provide an
additional verification by comparing a copy
of the form signed in the courtroom with the
commitment form generated through UCS.   In
the event of a discrepancy, the Detention
Center would contact the court to determine
which form had the correct information.

(*Id.* ¶ 12).   Ms. Hancock states that it is her "understanding
that this same process was in place when Mr. Day was the Clerk,
but as Chief Deputy Clerk, [she] was not involved in setting
these types of policies and cannot know for sure." (*Id.*).   This
unwritten policy was modified in 2009 as part of a routine audit
of the Clerk's Office that was performed by the Office of
Legislative Audits ("OLA").   (*Id.* ¶¶ 12, 15).   The OLA conducted
an audit of the Clerk's Office operations for the time period of
July 1, 2006 to June 20, 2009, and one of its recommendations
following the audit was that the Clerk's Office should have an
employee perform, on a test basis, "an independent verification
of UCS dispositions for both commitment and non-commitment cases
and that the Office should document the process." (*Id.* ¶ 15).
Ms. Hancock states that:

[a]lthough [she] was not aware of any prior
instances where a final criminal disposition
had been inaccurately recorded in UCS —

> besides the one involving Mr. Panowicz — the
> recommendation [of OLA] aligned with [her]
> desire to implement best practices within
> the office.  [She] therefore concurred with
> this recommendation and implemented formal
> procedure for independent review of ten
> percent of the UCS entries and commitment
> letters within the Clerk's Office.

(*Id.* ¶ 15).

### C.   Procedural Background

Plaintiff, proceeding *pro se*, commenced this action on August 29, 2011, by filing a complaint against Ms. Hancock, individually and in her official capacity as Clerk of the Circuit Court for Charles County, Maryland, alleging constitutional violations pursuant to 42 U.S.C. § 1983 and supplemental state law claims based on violations of Articles 19, 23, 24, and 40 of the Maryland Declaration of Rights and a violation of Maryland Code, Court and Judicial Proceedings § 2–201.  Plaintiff's complaint requests an award of compensatory and punitive damages, as well as injunctive relief in the form of expungement of his 2005 conviction and an order directing notice to others who may have been affected by any policy that led to inaccurate publication of criminal convictions in the Circuit Court for Charles County.

Defendant moved to dismiss the complaint, arguing, *inter alia*, that she was entitled to Eleventh Amendment immunity in her official capacity and absolute judicial immunity in her

individual capacity.  Defendant's motion was granted in part and denied in part by memorandum opinion and order issued on September 12, 2012.  (ECF Nos. 9 and 10).  As to the official capacity claim for money damages, the court found that circuit court clerks are state officials under Maryland law, and, therefore, not "persons" subject to suit for money damages under § 1983.  It was further determined that retrospective injunctive relief — *i.e.,* expungement of a criminal conviction — was not available to Plaintiff, and that prospective relief — *i.e.,* notice to others potentially affected — was not supported by the complaint, which acknowledged that a policy had been put in place to prevent future errors.  Plaintiff's claim alleging a violation of Article 40 of the Maryland Declaration of Rights was also dismissed because it was found that Plaintiff's right to freedom of speech was not implicated by the alleged defamation.  Plaintiff's claim alleging a violation of Md. Code Ann., Cts. & Jud. Proc. § 2-201 was also dismissed because this article does not provide a private cause of action.  With regard to Plaintiff's individual capacity claim under § 1983, the court rejected Defendant's argument that she was entitled to absolute judicial immunity and found that the complaint stated a claim for supervisory liability, but that "Plaintiff's ultimate burden in proving deliberate indifference is heavy[.]"  (ECF No. 9, at 29).  It was also noted that:

> To the extent that Defendant may have known
> of a propensity for such errors and failed
> to respond, whether by implementing a formal
> policy or providing training to her
> subordinates, Plaintiff has set forth a
> sufficient § 1983 claim against Defendant in
> her individual capacity, albeit by a very
> thin margin.

(*Id.* at 29-30) (internal citation and quotation marks omitted).
Plaintiff's claims alleging violations of Articles 19, 23, and
24 were permitted to proceed as state law analogues to the
surviving § 1983 claim.

The parties cross-moved for reconsideration of the court's
memorandum opinion and order adjudicating Defendant's motion to
dismiss. (ECF Nos. 11 and 13). Defendant's motion for
reconsideration was based on the novel assertion that she was
not the Clerk of the Circuit Court for Charles County at the
time Plaintiff alleges Defendant Hancock failed to take action
as the Clerk. (ECF No. 12). In response, Plaintiff asserted
that Defendant Hancock's predecessor, Richard A. Day III, who
was then deceased "was the proper Clerk of the Circuit Court for
Charles County at the time in question" and moved to amend his
complaint to add Mr. Day, Mr. Day's estate, and the
Commissioners of Charles County, Maryland as well as a claim for
ineffective assistance of counsel. (ECF No. 16). On May 17,
2013, the court denied both parties' motions for reconsideration
and Plaintiff's motion to amend the complaint, stating that "the

timing of Ms. Hancock's tenure as clerk is not a material issue"
because Ms. Hancock was "installed as a clerk of the circuit
court at all relevant times" during which the actions Plaintiff
had complained of occurred. (ECF Nos. 19 and 20). Moreover,
Plaintiff's motion to amend the complaint to add the
commissioners "in an apparent attempt to revive Plaintiff's
official capacity § 1983 claim" was also denied, as it was found
that "it is not at all clear how the commissioners could be
responsible for a policy of the clerk's office, and the
complaint does not state a plausible claim against them." (ECF
No. 19, at 11). Plaintiff's motion to amend the complaint to
add a claim for ineffective assistance of counsel was also
denied as it was found to be "patently meritless, as the
performance of Plaintiff's counsel in any criminal proceeding is
not at issue." (*Id.*). Following adjudication of the parties'
cross-motions for reconsideration, Defendant Hancock answered
the complaint, and the parties began discovery. (ECF Nos. 21
and 22).

Shortly thereafter, on June 11, 2013, Plaintiff moved
pursuant to Rule 60(b) to correct the record to clarify that,
contrary to the court's statement in its May 17, 2013 memorandum
opinion, Plaintiff was alleging that the Clerk erroneously
recorded his original judgment in 2005. (ECF No. 23). The

14

undersigned granted Plaintiff's request to correct the record, but noted that:

> [T]he court declines to reconsider its prior rulings at this juncture, in light of the fact that discovery is ongoing and will likely reveal what errors were made and when.  If Plaintiff uncovers evidence that damages arose as a result of an erroneous recording [of his judgment] prior to the time Ms. Hancock was the clerk, he will be permitted to renew his motion [to amend] at that time, submitting such evidence in support.  At present, the record shows only that the commitment record in 2008 erroneously recorded his judgment.

(ECF No. 24, at 2).  Plaintiff was permitted to seek discovery on the issue of whether his original judgment was falsely recorded.

After a lengthy discovery period, the court issued a letter order to the parties on October 3, 2014, indicating that pursuant to Judge Day's discovery hearing that was held on October 2, 2014, discovery was closed and summary judgment motions were due on November 17, 2014.  (ECF No. 61).  On November 17, 2014, Defendant moved for summary judgment.  (ECF No. 64).  Plaintiff filed an opposition and counter moved for summary judgment on December 8, 2014.  (ECF Nos. 69, 72, and 72-14).[2]  The parties' cross-motions for summary judgment are fully

---

[2] On April 10, 2015, Plaintiff moved to supplement his opposition and reply motions, asserting that the clerk had improperly docketed his previous opposition (ECF No. 72-14), and responding to the recent opinion from Judge Day (ECF No. 85)

briefed.   (ECF Nos. 80, 84, and 86).   On November 20, 2014, Plaintiff moved to amend his complaint.   (ECF No. 67).   This motion is also fully briefed.   (ECF Nos. 68 and 73).

## II. Plaintiff's Motion to Amend the Complaint

Plaintiff's motions to amend the complaint and for summary judgment attempt to re-litigate a number of issues that have previously been decided.   In making such requests, Plaintiff continues to rehash old arguments and does not provide any sufficient basis for reconsideration of the undersigned's prior rulings.   The undersigned has reviewed carefully Plaintiff's filings, and only those claims and arguments that have not already been addressed will be examined here.

On November 20, 2014, Plaintiff moved to amend the complaint pursuant to Rule 15(a) to add several causes of action and join additional parties.[3]   (ECF No. 67).   Plaintiff proposes

---

clarifying his earlier ruling on a discovery dispute over Defendant's interrogatory response regarding her affirmative defenses.   (ECF No. 86).

[3] Typically when parties move to amend the pleadings at this stage in the proceedings, in addition to Rule 15(a) they must first satisfy Rule 16(b)(4), which requires parties to show "good cause" why they have not met the deadline set in the scheduling order for amendment of pleadings and joinder of parties.   *See Aloi v. Moroso Inv. Partners, LLC*, No. DKC 11-2591, 2013 WL 6909151, at *3-4 (D.Md. Dec. 31, 2013) (finding that when the deadline in the scheduling order for amendment of pleadings had "long since passed . . . the parties must do more than satisfy the liberal standard of Rule 15(a); they must first meet the mandates of Rule 16(b)(4)").   Here, however, the scheduling order does not provide a deadline for amendment of

to amend the complaint to add as defendants Richard Day III and the County Commissioners of Charles County, Maryland.   In addition, Plaintiff moves to amend the complaint to add six causes of action for:   (1) violation of his Sixth Amendment right to effective assistance of counsel; (2) violation of his First and Fourteenth Amendment rights of access to the courts; (3) violation of his Fifth Amendment right against double jeopardy; (4) violation of his Fifth and Sixth Amendment rights related to plea bargains; (5) defamation; and (6) constructive fraud.   Plaintiff asserts in this motion that "this Court instructed the Plaintiff to wait until discovery had completed before filing another request for leave to file an Amended complaint[.]"  (*Id.* at 3).

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend the complaint] when justice so requires."  The court should deny leave to amend only when "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Edwards v. City of Goldsboro,* 178 F.3d 231, 242 (4th Cir. 1999) (internal citation and quotation marks omitted).

---

the pleadings and joinder of parties.   Accordingly, Plaintiff must only satisfy Rule 15(a) in order to amend his complaint.

A.    Additional Claims

Plaintiff's request to add four constitutional and two state-law causes of action will be denied for the following reasons. Plaintiff's motion to amend the complaint to add a claim for ineffective assistance of counsel has already been denied on the ground that it is patently meritless. (ECF No. 19, at 11). Plaintiff provides no new allegations that in any way suggest that Defendant's actions interfered with his right to counsel during his criminal proceeding. Accordingly, this claim is still meritless.

Plaintiff also asserts a claim for violation of his First and Fourteenth Amendment right of access to the courts alleging that because his plea bargain was not given proper effect, he was denied access to the courts. As noted by the United States Court of Appeals for the Fourth Circuit in *Plyler v. Moore,* 100 F.3d 365, 373 (4th Cir. 1996), "[t]he right of access to the courts is the 'right to bring to court a grievance that the inmate wished to present,' and violations of that right occur only when an inmate is 'hindered [in] his efforts to pursue a legal claim.'" *Id.* (*quoting Lewis v. Casey,* 518 U.S. 343 (1996)). Plaintiff's allegations do not implicate his right of access to the courts because none of the facts he asserts indicate that he was hindered in his efforts to seek relief from the courts.

18

Plaintiff contends that Defendant violated his Fifth Amendment right against double jeopardy because Defendant's erroneous recording of his conviction as a third-degree sex offense in the official court records "legally and effectively convicted Plaintiff" of a third-degree sex offense when he had already entered a plea as to this claim for second-degree assault. (ECF No. 73, at 13). The Double Jeopardy Clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." "In general, the Double Jeopardy Clause 'forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.'" *U.S. v. Ford,* 703 F.3d 708, 710 (4th Cir. 2013) (*quoting Burks v. United States,* 437 U.S. 1, 11 (1978)). Plaintiff's allegations do not support a claim for double jeopardy as he was not prosecuted and convicted twice for the same crime. Instead, Plaintiff entered an Alford plea in 2005 as to the second-degree assault charge, and contrary to his assertions, the inaccurate recording of his conviction as a third-degree sex offense was not a second conviction for the same act, but rather a clerical error that was corrected as soon as Plaintiff petitioned the Circuit Court for Charles County to correct the error.

Plaintiff asserts a claim for violation of his rights related to plea bargains based on his allegation that "Defendants negated one major substantive aspect of the plea agreement by not properly recording, reporting and publishing the disposition of count three [the second-degree assault charge.]" (ECF No. 73, at 7). While it is true that "if the Government breaches express or implied terms of the plea agreement, a violation of due process occurs[,]" *United States v. Embree,* 262 F.App'x 499, 504 (4th Cir. 2008), the facts asserted by Plaintiff do not plausibly allege that the government breached the plea agreement. This is not an instance where the government reneged on its plea bargain promises; rather, it is a case of clerical error in recording a judgment of conviction. Indeed, based on Plaintiff's own allegations, the Charles County Circuit Court judge enforced his Alford plea agreement with the Government, reducing his original charge from third-degree sex offense to second-degree assault. The final disposition of Plaintiff's case was merely mistakenly recorded in the UCS records. When Plaintiff discovered that his conviction had been improperly recorded as a third-degree sex offense, he petitioned the Circuit Court for Charles County to correct the error, and his relief was granted. The reduced charge and corresponding sentence that Plaintiff bargained for was not altered by the Government. Moreover, Plaintiff's

sentence for this conviction was not impacted in any way by the clerical error.

Next, Plaintiff moves to amend his complaint to assert a state law claim for defamation. Defendant argues that Plaintiff's defamation claim is barred by the statute of limitations because it accrued at the latest in 2008 when Plaintiff became aware of the erroneous recording of his criminal conviction and Plaintiff failed to file his original complaint until 2011, approximately three years later. As aptly noted by Judge Messitte in *Gainsburg v. Steben & Co., Inc.,* 838 F.Supp.2d 339, 342 (D.Md. 2011), *aff'd,* 519 F.App'x 199 (4th Cir. 2013):

> Maryland law imposes a one year limitations period for defamation actions. Md. Code Ann., Cts & Jud. Proc. § 5-105. Although, ordinarily, the limitations period runs from the time that the defamatory statement is published, Maryland law follows the discovery rule, which provides that a cause of action accrues at the time the plaintiff "knows or reasonably should know of the wrong." *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.,* 566 F.Supp.2d 460, 464 (D.Md. 2008) (*quoting Hecht v. Resolution Trust Corp.,* 333 Md. 324, 334, 635 A.2d 394 (1994)).

Plaintiff acknowledges that he became aware of the erroneous recording of his conviction sometime in September or October 2008, when he was informed by a corrections officer at the Detention Center personnel that he could not be given work

release unless he registered as a sex offender due to his third-degree sex offense conviction in 2005. Plaintiff did not file his complaint in this suit until August 29, 2011. Accordingly, Plaintiff's defamation claim, which accrued at the latest in September or October of 2008, is barred because he did not file suit within the one-year limitations period.

Finally, Plaintiff moves to amend his complaint to add a state law claim for constructive fraud based on his allegations that "[t]he Clerk's Office, Chief Deputy Clerk, Commissioners, Mr. Day and Ms. Hancock committed a constructive fraud on Plaintiff [] by recording, and reporting on the Internet, a false felony sex offense conviction[.]" (ECF No. 67-6, at 38). Plaintiff asserts that this false recording did not reflect the plea he had entered, the conviction the judge rendered, nor "was this false disposition what was contained in the courtroom papers that the courtroom clerks prepared and presented to Plaintiff on the day of the sentencing hearing in June, 2005[.]" (*Id.* ¶ 149). Plaintiff alleges that "Defendant[s] violated the legal duty of properly recording criminal case dispositions" and that "Plaintiff justifiably relied upon the documents provided by the courtroom clerk from June, 2005" and "due to the constructive fraud, was effectively damaged[.]" (*Id.* ¶¶ 150-155).

"Constructive fraud is a 'breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.'" *Dierker v. Eagle Nat'l Bank,* 888 F.Supp.2d 645, 655 (D.Md. 2012) (*quoting Canaj, Inc. v. Baker and Div. Phase III, LLC,* 391 Md. 374 (2006)). As aptly noted by Judge Quarles in *Dierker v. Eagle National Bank,* 888 F.Supp.2d 645, 656 (D.Md. 2012):

> To establish constructive fraud, a plaintiff must show a breach of a legal or equitable duty. Although the tort often involves the breach of a fiduciary duty, no authority bars a constructive fraud claim on the basis of a legal duty of care under negligence principles. Thus, if a reasonable jury could find that [the defendant] owed the [plaintiff] a duty of care, there is a genuine dispute about whether the [plaintiff] [has] established a legal duty necessary for their constructive fraud claim.

*Id.* (internal citations and quotation marks omitted).

Defendant advances two arguments for why Plaintiff's constructive fraud claim is futile: (1) Plaintiff has failed to allege facts establishing a plausible claim for constructive fraud because he has "confuse[d] the Clerk's statutory obligations under Md. Code Ann., Cts. & Jud. Proc., § 2-201, to make 'proper legible entries of all proceedings of the court' with a legal duty that might arise out of a fiduciary or

23

confidential relationship" (ECF No. 68, at 14); and (2)
Defendant is statutorily immune from this claim pursuant to the
Maryland Tort Claims Act ("MTCA") because her actions were
performed within the scope of her employment and were not
alleged to have been done with malice or gross negligence.  It
is only necessary to address Defendant's second argument
regarding state statutory immunity.

"Under the MTCA, State personnel . . . are immune from
liability 'for a tortious act or omission that is within the
scope of the public duties of the State personnel and is made
made without malice or gross negligence.'"  *Estate of Saylor v.
Regal Cinemas, Inc.*, 54 F.Supp.3d 409, 422 (D.Md. 2014) (*citing*
Md. Code Ann., Cts. & Jud. Proc. § 5-522(b)).  As previously
indicated in this suit, Charles County Circuit Court clerks are
considered "state personnel" within the meaning of the Maryland
Tort Claims Act.  Md. Code Ann., State Gov't § 12-101(a)(11)
(defining "state personnel" under the MTCA as including "an
employee of a circuit court").  "For the purposes of MTCA
immunity, 'malice' refers to so-called 'actual malice,' *i.e.,*
'conduct characterized by evil or wrongful motive, intent to
injure, knowing and deliberate wrongdoing, ill-will or fraud[,]"
*Estate of Saylor,* 54 F.Supp.3d at 422 (*quoting Lee v. Cline,* 384
Md. 245 (2004)), whereas "Maryland courts view gross negligence
as 'something *more* than simple negligence, and likely more akin

to reckless conduct.'"   *Id.* (emphasis in original) (*quoting*
*Taylor v. Harford Cnty. Dep't of Soc. Servs.,* 384 Md. 213
(2004)).  Gross negligence "is an intentional failure to perform
a manifest duty in reckless disregard of the consequences as
affecting the life or property or another and also implies a
thoughtless disregard of the consequences without the exertion
of any effort to avoid them."   *Id.* (internal citation and
quotation marks omitted).

Plaintiff merely uses conclusory labels that Defendant has
acted with "reckless disregard" and "gross negligence" without
providing facts to support it.  (ECF No. 73, at 14).  First,
Plaintiff seems to allege that Defendant was grossly negligent
because she had several opportunities to correct his
inaccurately recorded conviction but failed to do so.  (*See,*
*e.g.,* ECF No. 67-6 ¶ 137).  The opportunities cited by
Plaintiff, however, involve several instances occurring between
2005 and 2008 where employees in the Clerk's Office purportedly
dealt with paperwork related to Plaintiff's case and failed to
notice the mistake in his UCS record or the discrepancy between
his charges as listed in the paper forms filled out by the
courtroom clerks and the UCS record.  None of these instances
directly involved conduct by Defendant Hancock, however.
Plaintiff does not allege that Defendant Hancock was directly
involved in the original inaccurate recording of Plaintiff's

final conviction or that she handled Plaintiff's case file on subsequent occasions. Plaintiff's only allegations relating to "grossly negligent" conduct by Defendant Hancock is that she "ratified" the original error made by one of her subordinates because several of Plaintiff's commitment records produced by the Clerk's Office in 2008, which contained the inaccurate conviction, were "electronically signed" by Defendant Hancock. The fact that Defendant's electronic signature appears on a document that contains Plaintiff's erroneous conviction does not create a plausible inference that Defendant was grossly negligent. Nor would gross negligence plausibly be suggested even if Defendant had actually reviewed the documents (which the presence of her electronic signature does not necessarily establish) and failed to notice that Defendant's conviction was listed incorrectly. Plaintiff has not alleged that Defendant knew of his original conviction or any other fact suggesting that Defendant should have been on notice that Plaintiff's conviction was listed incorrectly, such that her failure to catch this error was in reckless disregard of the consequences it may have on Plaintiff.

Next, Plaintiff asserts that new information surfaced during discovery which suggests that someone in the Clerk's Office intentionally or negligently maintained the incorrect listing of his conviction in UCS, while simultaneously sending

the correct conviction to the Federal Bureau of Investigation. Specifically, Plaintiff alleges that after he was extended a job offer in 2012 and it was later rescinded, he requested a copy of his background investigation from the Office of Personnel Management and was given his Federal Bureau of Investigation Rap Sheet ("FBI Rap Sheet"), which was issued on January 5, 2012. (ECF No. 67-1, at 4).[4]  Plaintiff attaches this report to his proposed amended complaint and asserts that the FBI Rap Sheet shows that the Clerk's Office supplied the FBI the correct information regarding his conviction in 2005, while maintaining the erroneous conviction in its own records, arguing that this shows that an employee of the Clerk's Office acted with malice or gross negligence. (ECF No. 67-3).  Plaintiff's argument will be rejected as the document he relies upon does not support his contentions.  *See Fare Deals, Ltd. v. World Choice Travel.com, Inc.,* 180 F.Supp.2d 678, 683 (D.Md. 2001) ("When the bare

---

[4] Plaintiff also attaches as exhibit 3 (ECF No. 67-4), a form that was purportedly "provided by Parole and Probation as an attachment to the December[] 2006 petition for a hearing for a violation of probation." (ECF No. 67-1, at 4).  Plaintiff appears to be arguing that because this form contains the correct disposition of his charges, it shows that the mistake in the UCS record was made intentionally or with reckless disregard.  The fact that probation had the correct disposition of Plaintiff's charges while UCS had the incorrect disposition, does not provide a plausible inference that the discrepancy was a result of gross negligence or malice.  At most it suggests that a member of the Clerk's Office acted negligently, but says nothing about whether Defendant Hancock acted with malice or gross negligence.

allegations of the complaint conflict with any exhibits or other documents, whether attached or adopted by reference, the exhibits or documents prevail."). The report Plaintiff relies upon shows his "Criminal History Record" as of January 5, 2012, well after the Charles County Circuit Court corrected Plaintiff's record in November 2008. Accordingly, based on Plaintiff's own assertion that the FBI is fed information directly from the Maryland Criminal Justice Information System, which is fed information from UCS (ECF No. 73, at 7), the FBI's system would have also reflected the incorrect disposition of his 2005 case until 2008 when the UCS docket was amended. Moreover, the FBI Rap Sheet does not support Plaintiff's contention that the FBI had the correct disposition of his charges in 2005. Indeed, the document states that it contains Plaintiff's criminal history record as of *January 5, 2012* and that "the information in this rap sheet . . . is the most current criminal history record information available[,]" meaning that it would contain any alterations or updates to his criminal history up until 2012, including the 2008 correction. (ECF No. 67-3).

Finally, Plaintiff has alleged that Defendant was grossly negligent for failing to adopt a formal policy in the Clerk's Office of reviewing final case dispositions that were entered into UCS. As will be seen, because the Clerk's Office had an

informal policy of reviewing judgments and Plaintiff has not alleged that there was a common problem of Clerk's Office employees making errors when entering case dispositions, Defendant's failure to adopt a formal policy for reviewing case dispositions is not indicative of gross negligence.  Although Plaintiff's allegations indicate that Defendant or another member of the Clerk's Office may have been negligent by inaccurately recording Plaintiff's original judgment of conviction and by failing to notice this clerical error until it was brought to the court's attention, Plaintiff's allegations do not support that Defendant herself acted with gross negligence or malice.  Plaintiff's request to amend his complaint to add a claim for constructive fraud will be denied, as Defendant is entitled to state statutory immunity for her conduct.[5]

---

[5] Plaintiff also contends that "[o]n October 2, 2014, Magistrate [Judge] Day held that Ms. Hancock waived all of her affirmative defenses" including state statutory immunity. (ECF No. 73, at 14).   This misrepresents Judge Day's holding, however.  Judge Day clarified in his March 17, 2015 order that "to the extent that Defendant knew certain facts when she provided her answers to interrogatories and failed to articulate those facts in support of an affirmative defense she is precluded from asserting those facts at trial." (*See* ECF No. 85) (order clarifying holdings from October 2, 2014 hearing).  After reviewing the disputed interrogatory answers, Plaintiff's contentions that Defendant has waived her affirmative defenses have no merit because Defendant does not articulate new facts in her motion for summary judgment to support her affirmative defenses; she relies on the same facts she provided in the interrogatories. (ECF No. 86-1, at 5-7).

**B.    Additional Parties**

Plaintiff also moves to amend the complaint to add as additional Defendants:    Richard Day III and his estate, individually and in his official capacity as Clerk of the Circuit Court for Charles County; and the County Commissioners of Charles County, Maryland ("County Commissioners").[6]

Plaintiff's request to amend his complaint to add the County Commissioners as defendants will be denied as it is duplicative of the request he made on January 18, 2013 (ECF No. 16), and it is futile, as Plaintiff fails to cure the pleading deficiencies identified in his first motion to amend; namely, "it is not at all clear how the commissioners could be responsible for a policy of the clerk's office, and the complaint does not state a plausible claim against them." (ECF No. 19, at 11).

Plaintiff also moves to amend his complaint to add as a defendant the former Clerk of the Circuit Court for Charles County,  Richard Day III (and his estate), individually and in his official capacity.   This request is problematic for many

---

[6] Plaintiff also moved to add Sharon Hancock "under a different title" in her official capacity as Chief Deputy Clerk for the Circuit Court for Charles County, Maryland.   This request will be denied as Ms. Hancock is already a Defendant, the claims against her in her official capacity as Clerk of Court have been dismissed, and any claims against her in her official capacity as Chief Deputy Clerk fail for the same reasons.

reasons, in part because of its timing and the fact that Richard Day III ("Clerk Day") is deceased, but Plaintiff's request to add Clerk Day as a defendant will ultimately be denied because, even were he or the estate made a party, summary judgment would be granted in their favor.  As will be seen, the evidence provided by Plaintiff fails to establish his § 1983 claim based on supervisory liability and his related state law claims against the Clerk of Court, whether against Clerk Day or his successor, Defendant Hancock.  Accordingly, judgment will be entered against Plaintiff.

## III. Cross-Motions for Summary Judgment

Defendant Hancock moves for summary judgment on all remaining counts in Plaintiff's complaint, namely, Plaintiff's 42 U.S.C. § 1983 claim against Defendant in her individual capacity and Plaintiff's related state law claims arising from the same facts for violations of Articles 19, 23, and 24 of the Maryland Declaration of Rights.  Plaintiff opposes Defendant's motion for summary judgment and has filed a cross-motion for summary judgment.

### A.   Standard of Review

A court may enter summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Emmett v.*

*Johnson,* 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (*quoting* former Fed.R.Civ.P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney,* 327 F.3d 307, 314 (4th Cir. 2003).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50 (citations omitted).  At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris,* 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC,* 630 F.3d 351, 354 (4th Cir. 2011).  The court must deny both motions if it

finds there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (3d ed. 1998).

### B.   Analysis

### 1.   42 U.S.C. § 1983 Claim

Section 1983 authorizes a suit for damages against any individual "who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must show that:  (1) the defendant deprived him of a right secured by the Constitution or laws of the United States; and (2) that any such deprivation was committed by a person acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988).

Plaintiff's § 1983 claim is based on a purported violation of his substantive and procedural due process rights which he argues was caused by the Clerk's Office's inaccurate recording of his 2005 conviction as a third-degree sex offense and the erroneous publication of this conviction on the Maryland JCS website.   Plaintiff argues that this defamatory publication

harmed him in numerous ways, including causing the loss of his private employment with Sprint, making him ineligible for work release during his confinement at the St. Mary's Detention Center, and causing the Detention Center to require him to register as a sex offender.  Plaintiff argues that Defendant, as Clerk of Court, is liable under a theory of supervisory liability for her subordinate's inaccurate recording of and subsequent publication of his conviction and the harms that it caused him because:  she failed to adopt a formal policy in the Clerk's Office for ensuring the proper recording of criminal case dispositions; she failed properly to supervise Clerk's Office employees; and she personally ratified the error made by her subordinates by signing Plaintiff's commitment records in 2008, which contained the erroneous conviction.  (ECF No. 72-1, at 2-3).

State law defamation, by itself, does not deprive a plaintiff of a liberty or property interest "sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis,* 424 U.S. 693, 693-97 (1976).  To state a due process claim, a plaintiff must establish that, in addition to the defamatory statement, a right or status was altered or extinguished.  Such claims are commonly referred to as "stigma-plus" claims. *Velez v. Levy,* 401 F.3d 75, 87 (2[d] Cir. 2005).  As

Judge Messitte explained in *Grimes v. Miller,* 448 F.Supp.2d 664,

673 (D.Md. 2006):

> A "stigma-plus" claim requires [the
> plaintiff] to show: "(1) the utterance of a
> statement 'sufficiently derogatory to injure
> his or her reputation, that is capable of
> being proved false, and that he or she
> claims is false,' and (2) a material state-
> imposed burden or state-imposed alteration
> of plaintiff's status or rights." *Sadallah
> v. City of Utica,* 383 F.3d 34, 38 (2ᵈ Cir.
> 2004) (citations omitted).

Defendant seeks summary judgment on Plaintiff's § 1983

claim on several grounds:  (1) Plaintiff cannot prove a

constitutional injury based on a stigma-plus claim because his

reputational injury was not accompanied by a state action that

altered or extinguished Plaintiff's rights or legal status; (2)

Plaintiff cannot prove that Defendant is liable based on a

theory of supervisory liability or based on her purported

ratification of the filing error; and (3) Defendant is entitled

to qualified immunity.  Because Plaintiff's § 1983 claim hinges

on the viability of his theory of supervisory liability, that

issue will be addressed first.

It is well established that the doctrine of respondeat

superior does not apply in § 1983 claims.  *See Love-Lane v.

Martin,* 355 F.3d 766, 782 (4ᵗʰ Cir. 2004) (no respondeat superior

liability under § 1983).   In discussing the liability of

supervisors for constitutional violations by their subordinates,

the Fourth Circuit explained in *Moore v. Greenwood School District No. 52,* 195 F.App'x 140, 144 (4th Cir. 2006), that:

> Supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates. *See Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir. 1984).  We have articulated a three-part test to establish supervisory liability under § 1983:  "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."  *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).
>
> In *Randall v. Prince George's County,* 302 F.3d 188, 206 (4th Cir. 2002), this Court concluded that, "[u]nder the first prong of *Shaw*, the conduct engaged in by the supervisor's subordinates must be 'pervasive,' meaning that the 'conduct is widespread, or at least has been used on several different occasions.'"  Furthermore, in establishing "deliberate indifference" under *Shaw's* second prong, a plaintiff "[o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct."  *Id.* (*quoting Slakan,* 737 F.2d at 373).

36

Defendant Hancock challenges whether Plaintiff has met his burden in establishing the first and third elements of this claim.   As to the first element, Defendant argues that Plaintiff's supervisory liability claim fails because he cannot prove that Defendant Hancock had any actual or constructive knowledge that her subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiff.   Defendant also challenges whether Plaintiff has established an affirmative causal link between her alleged inactions and the constitutional injury because she was not the Clerk of Court when Plaintiff's conviction was inaccurately recorded in 2005 and therefore was not responsible for the actions of Clerk's Office employees or the policies that were in place at that time.   In addition, Defendant argues that Plaintiff cannot show a causal link between Defendant's purported inactions and the constitutional injury because the injury was the result of multiple intervening causes.

Based on the evidence presented, Plaintiff has failed to meet his heavy burden of establishing Defendant Hancock's deliberate indifference by showing "continued inaction in the face of documented widespread abuses." *Slakan*, 737 F.2d at 373. Moreover, Plaintiff has failed to establish an affirmative causal link between his injury and the purported inactions of

Defendant, as discovery revealed that Defendant Hancock was not the Clerk of Court when the inaccurate recording of Plaintiff's conviction in UCS originally occurred; rather, Clerk Day was Clerk of Court and responsible for supervising the employees in the Clerk's Office and setting Clerk's Office policies. (ECF No. 64-2 ¶¶ 3-5, 8-9). In her role as Chief Deputy Clerk, which Defendant held through mid-September 2005, she was not responsible for supervising the activities which have purportedly caused Plaintiff's injuries. Accordingly, Plaintiff has failed to establish the third part of the test for supervisory liability as to Defendant Hancock.

Second, Plaintiff has presented no evidence that Defendant Hancock or Clerk Day were aware or should have been aware that Clerk's Office employees were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiff, but demonstrated deliberate indifference to this risk. Indeed, the inaccurate recording of Plaintiff's judgment of conviction appears to be the only recording mistake of this nature made by the Clerk's Office. (ECF No. 64-2 ¶ 16). In her affidavit, Ms. Hancock states that she did not learn of the error in Mr. Panowicz's case until 2009, and she is "unaware of any other instance where a final criminal disposition from the Circuit Court for Charles County has been inaccurately recorded in the UCS or incorrectly

published on the Judiciary Case Search Website. [She] did not have reason to suspect that the training and data-entry policies in place were insufficient to ensure the accurate recording of criminal dispositions in UCS." (*Id.* ¶ 13).

Plaintiff points to the legislative audit report that was produced in 2009 as evidence that Defendant Hancock should have been aware that the Clerk's Office's informal policy in reviewing entry of case dispositions was inadequate to catch errors like the one that occurred in his case. (ECF No. 72-14, at 34). Plaintiff argues that this report should have given Defendant Hancock notice that there was a possibility of Clerk's Office employees making errors in entering case dispositions. Plaintiff also points to several judicial opinions and briefs, which discuss isolated incidents in which errors occurred in other cases in the Circuit Court for Charles County. *See State v. Prue,* 414 Md. 531 (2010) (Charles County Circuit Court judge failed to announce the verdict on several counts for which the criminal defendant had been indicted); *State v. Santiago,* 412 Md. 28 (2009) (noting that because counsel did not request a jury poll and the clerk failed to hearken the jury during a trial in the Circuit Court for Charles County, the guilty verdict was a nullity); *Savoy v. Maryland,* 336 Md. 355, 360 n.6 (1994) (noting that the docket entry describing a violation of probation hearing that occurred in the Circuit Court for Charles

County did not accurately describe all of the reasons why the appellant's probation was revoked); Brief of Appellant, *Moore v. State,* 2005 WL 5366152, at *12 n.7 (Md. Ct. Spec. App. Dec. 30, 2005) (arguing that the docket entry for a status hearing held in the Circuit Court for Charles County mistakenly stated that defense counsel had waived defendant's presence at the hearing and that the trial transcript showed otherwise). Plaintiff contends that the errors documented in these cases should have put Defendant Hancock on notice of a widespread issue, and are indicative of her indifference to the harm being done by the Clerk's Office. None of the errors referenced in the cases cited by Plaintiff, however, are remotely similar to the error made in Plaintiff's case — a failure by an employee in the Clerk's Office accurately to transcribe the final disposition of a case from the paper form created by the courtroom clerk to the UCS. Nor do the errors show a pattern of constitutional violations by Clerk's Office employees. Accordingly, even if there was a widespread issue of clerical errors being made in the Clerk's Office, which it does not appear that there was, there is no evidence that these errors would have put Defendant Hancock or Clerk Day on notice of a pattern of *constitutional* violations similar to the one asserted by Plaintiff. *See Randall,* 302 F.3d at 207 (rejecting the cross-appellants' § 1983 claim based on supervisory liability because cross-appellants

had "presented no evidence that [the supervisor] knew about any propensity for unlawful action by his subordinates, and they provided no evidence that he had an opportunity to prevent recurrences"). Moreover, due to their timing, the legislative audit (2009) and the issuance of the opinions in *Prue* (2009) and *Santiago* (2010) would certainly not have put Clerk Day on notice during his tenure as Clerk or Defendant Hancock on notice in 2005, when the original inaccurate recording of the judgment occurred, or in 2006 when it was published on the JCS website, that there was a widespread pattern of erroneous recordings of criminal case dispositions such that they had an opportunity to prevent Plaintiff's injury but were deliberately indifferent and failed to take any action. In fact, when the Office of Legislative Audits recommended in 2009 that Defendant Hancock have an employee perform independent verification of UCS dispositions for both commitment and non-commitment cases on a test basis, Defendant Hancock adopted this recommendation. She implemented a formal procedure for independent review of ten percent of UCS entries and commitment letters within the Clerk's Office, which shows that when Defendant Hancock was put on notice in 2009 that the Clerk's Office informal policy may have been inadequate, she was not deliberately indifferent, but instead changed the policy. (ECF No. 64-2 ¶ 15). As noted by the Fourth Circuit in *Randall*, 302 F.3d 188, the premise of

41

supervisory liability is that "the failure to supervise contributed to the constitutional deprivation in question." *Id.* at 207. "Because supervisors 'cannot be expected to promulgate rules and procedures covering every conceivable occurrence,' and because they may be powerless to prevent deliberate unlawful acts of subordinates, the courts have appropriately required proof of multiple instances of misconduct before permitting supervisory liability to attach." *Id.* (*quoting Slakan,* 737 F.2d at 373). Here, Plaintiff has failed to meet his burden to show sufficient instances of misconduct in the Clerk's Office in order to establish the supervisory liability of the Clerk, whether it be Clerk Day or Defendant Hancock.

Finally, Plaintiff argues that Defendant has personally participated in the constitutional violation and is therefore liable because she ratified the original data error that was made by one of her subordinates in 2005 by signing multiple commitment orders in 2008, which contained the inaccurate conviction. Plaintiff argues that Defendant's ratification of the inaccurate conviction in the commitment orders "is strong evidence to support the mental aspect of reckless disregard and deliberate indifference on the part of Ms. Hancock[.]" (ECF No. 72-14, at 34). As Defendant points out, however, she did not personally review and sign the commitment records in question as the Clerk is not typically involved in the preparation of

commitment orders; rather, when a criminal defendant is sentenced to confinement a member of the Clerk's Office generates a commitment record through UCS and the record is stamped with the Clerk's signature by the employee preparing it, or when a temporary commitment order is issued, it is stamped with the Clerk's signature and initialed by the employee preparing it. (ECF No. 80-2 ¶¶ 2-3). In her deposition, Ms. Hancock specifically testified that: she did not take any actions personally with respect to Plaintiff's criminal case disposition or sentencing or have any personal knowledge about them; she did not have any communication with St. Mary's Detention Center in regard to Plaintiff; and she did not personally issue any of his commitment orders. (ECF No. 64-3, at 33). Moreover, because the error in Plaintiff's UCS record was not brought to the Clerk's Office's attention until the fall of 2008, the Clerk's Office employees processing the paperwork in Plaintiff's case from 2005 until the error was discovered, would have had no reason to be on notice that the information in the UCS electronic record conflicted with the information in Plaintiff's paper record. Accordingly, Plaintiff's argument that Defendant should be held liable because she ratified the original recording error is unpersuasive. Defendant never personally reviewed Plaintiff's commitment orders, and even if she had, there is no indication that she could have ratified the

43

error because there was no reason for her to be on notice that the conviction listed in the commitment order was inaccurate because she had no knowledge of Plaintiff's Alford Plea or his actual conviction in September 2005. (ECF No. 64-3, at 33); *see Hall v. Marion Sch. Dist. No. 2,* 31 F.3d 183, (4th Cir. 1994) (acknowledging that a municipality could be held liable under § 1983 if a final decision maker *ratified* the acts of their employees, but only if the final decision maker was *fully aware* and condoned his subordinates' unconstitutional acts)**;** *see also Livers v. Schenck,* 700 F.3d 340, 357 (8th Cir. 2012) (finding that, in contrast to municipalities, an individual could not be held liable for ratifying a constitutional violation by his subordinate after it occurred because it would "violate the principle that a supervisor who does not directly participate in an employee's constitutional violation can only be liable for the violation when it was caused by the supervisor's failure to train or supervise his or her employees properly" (*citing Wagner v. Jones,* 664 F.3d 259, 275 (8th Cir. 2011)).

## 2. State Law Claims

Plaintiff's state law claims asserting violations of the Maryland Declaration of Rights Articles 19, 23, and 24 are essentially premised on the same theory of liability as his § 1983 claim — that Defendant Hancock and Clerk Day are liable for his injuries because they failed adequately to supervise their

44

subordinates who made the error; failed to implement a formal policy for reviewing case disposition entries in UCS; and Defendant Hancock failed to notice the error in Plaintiff's commitment records when she signed them.  (ECF No. 72-14, at 38).  Plaintiff also asserts that these claims are based on "intentional conduct that includes intentionally publishing the false-void conviction[.]" (*Id.*).

Defendant moves for summary judgment on Plaintiff's state law claims arguing that she has state statutory immunity because Plaintiff has failed to provide evidence that she acted with malice or gross negligence in performing her duties as Clerk. According to Defendant, Plaintiff cannot prove that she acted with gross negligence because "she was not responsible for supervising the entry of criminal dispositions when the relevant errors occurred and was not aware of any similar errors that could have alerted her that the office's procedures were not sufficient to ensure the accurate entry of the final dispositions." (ECF No. 64-1, at 45).  Defendant also contends that she is entitled to summary judgment on Plaintiff's state law claims because the state constitutional provisions upon which they are based must be interpreted *in pari materia* with the Due Process Clause of the Fourteenth Amendment, and Plaintiff has failed to prove his federal claims based on a

violation of his Fourteenth Amendment due process rights.   It is only necessary to address Defendant's first argument.

As previously noted, Clerks of the Circuit Court of Charles County are considered state personnel under the MTCA and are immune from personal liability for allegedly tortious acts or omissions that are within the scope of their public duties and are made without malice or gross negligence.  *Estate of Saylor,* 54 F.Supp.3d at 422; Md. Code Ann., Cts. & Jud. Proc. § 5-522(b)).   Statutory immunity under the MTCA extends to tort claims based on alleged violations of the Maryland Declaration of Rights.  *Lee v. Cline,* 384 Md. 245, 256 (2004) ("The current language of the Maryland Tort Claims Act plainly appears to cover intentional torts and constitutional torts as long as they were committed within the scope of state employment and without malice or gross negligence.").

Taking the facts in the light most favorable to Plaintiff, he has failed to establish that Defendant Hancock or Clerk Day acted with malice or gross negligence.   Plaintiff appears to be advancing the same arguments and evidence in support of his state law claims as he does in support of his § 1983 claim based on supervisory liability.   The evidence which Plaintiff argues shows Defendant's and Clerk Day's reckless disregard and deliberate indifference was discussed in relation to his § 1983 claim, and for the same reasons it does not establish their

46

deliberate indifference, it also does not show that they were grossly negligent. First, Defendant Hancock could not have been grossly negligent for failing to supervise the employee who originally inaccurately recorded Plaintiff's conviction in 2005 because she was not Clerk at the time of the original recording and therefore, was not responsible for supervising the employee who made the error. In addition, Plaintiff has provided no evidence that Clerk Day had any personal involvement in the entry or review of Plaintiff's case disposition in UCS. Second, Defendant and Clerk Day were not grossly negligent for failing to implement a formal policy for reviewing case disposition entries in UCS because Plaintiff has provided no evidence that errors similar to the one in Plaintiff's case had previously been made by employees of the Clerk's Office, and therefore they had no reason to believe that the informal policy that was in place was inadequate. *Cf. Estate of Saylor,* 54 F.Supp.3d at 421-23 (finding that plaintiffs had adequately alleged gross negligence on the part of deputy defendants because the deputies had ignored warnings given by the decedent's caregiver that confronting him would lead to a hostile reaction and ignored the "risk of asphyxiation in handcuffing an obese individual behind his back" which was well-known in the law enforcement community). Indeed, there was no indication until the fall of 2008, well after Clerk Day's tenure had ended, when the error in

Plaintiff's case was brought to the Clerk's Office's attention that the informal policy of review may be inadequate to catch errors. Moreover, the fact that Defendant Hancock's name was stamped on several of Plaintiff's commitment records in 2008, which contained his erroneous conviction, does not suggest gross negligence on the part of Defendant Hancock because she did not actually review and sign these records, and even if she had, she would not have been on notice that the conviction was listed incorrectly because she never knew that Plaintiff's actual conviction was second-degree assault. *See also Farmer v. Maryland,* No. GJH-14-02584, 2015 WL 3560011, at *7-8 (D.Md. June 4, 2015) (finding that defendant who was a supervisor was entitled to state statutory immunity for failure to supervise/train his subordinate who committed constitutional violations because plaintiff had not provided any facts supporting that defendant supervisor acted with gross negligence or malice). Plaintiff's evidence in support of his claims simply does not show gross negligence or reckless conduct on the part of Defendant Hancock or Clerk Day, or an "intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another." *Estate of Saylor,* 54 F.Supp.3d at 422. Finally, Plaintiff's contention that his conviction was intentionally misrecorded, presumably in an attempt to show malice, finds no support in the

record and is based on pure speculation.   Accordingly, Defendant Hancock and Clerk Day are entitled to state statutory immunity on Plaintiff's state law claims.

## IV.   Conclusion

For the foregoing reasons, the motion to amend the complaint filed by Plaintiff will be denied.   In addition, Defendant's motion for summary judgment will be granted, Plaintiff's motion for summary judgment will be denied, and judgment will be entered in favor of Defendant.   A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
